Filed 2/28/14  Eagan Avenatti, LLP v. Parrish CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| EAGAN AVENATTI, LLP, | |
|     Plaintiff, Cross-defendant and Appellant, | G048143 |
| WILLIAM PARRISH et al., | (Super. Ct. No. 30-2011-00483570) |
|     Cross-complainants, Cross-defendants and Appellants, | O P I N I O N |
| MICHAEL J. AVENATTI, | |
|     Cross-defendant and Appellant; | |
|        v. | |
| ROBERT J. STOLL, JR., | |
|     Defendant, Cross-defendant and Respondent, | |
| STOLL, NUSSBAUM & POLAKOV, | |
|     Defendant, Cross-complainant, Cross-defendant and Respondent. | |

Appeals from an order of the Superior Court of Orange County, Franz E. Miller, Judge. Affirmed.

Eagan Avenatti, LLP and Scott H. Sims; Payne & Fears and Erik M. Andersen, for Plaintiff, Cross-defendants and Appellant Eagan Avenatti, LLP, and for Cross-complainants, Cross-defendants and Appellants William Parrish and E. Timothy Fitzgibbons, and for Cross-defendant and Appellant Michael J. Avenatti.

Lewis Brisbois Bisgaard & Smith LLP, and William John Rea, Jr.; The Ehrlich Law Firm and Jeffrey Isaac Ehrlich, for Defendant, Cross-defendant and Respondent Robert J. Stoll, Jr., and for Defendant, Cross-complainant, Cross-defendant and Respondent Stoll, Nussbaum & Polakov.

\*　　　\*　　　\*

## INTRODUCTION

This is an appeal from the denial of motions to compel arbitration. The respondents are the law firm Stoll, Nussbaum & Polakov (SNP) and Robert Stoll. The appellants are SNP's former clients E. Timothy Fitzgibbons and William Parrish (the former clients), another law firm, Eagan Avenatti (EA), and Michael Avenatti. SNP and EA, together with a third law firm, represented the former clients in a malicious prosecution action, which settled for $39 million. The three law firms had a fee-sharing agreement; SNP alleged that EA and the former clients cut it out of its share of the settlement proceeds, $5.4 million.

After about a year and a half of litigation, EA and the former clients moved to compel arbitration. Michael Avenatti moved to compel arbitration a month later. The trial court denied the motions because, among other reasons, the moving parties had engaged in "tons of litigation."

The record before us is somewhat unusual. In lieu of a clerk's transcript, the appellants have filed an appendix, which they style "appendix of exhibits supporting

2

appellant's [*sic*] opening brief," in three volumes.  Respondents' appendix spans eight volumes.  Perusing appellants' appendix would convey no idea of what the trial court meant by "tons of litigation."  Fortunately, respondents' appendix is more illuminating on this point.

California Rule of Court, rule 8.124 requires an appellant's appendix to include any item necessary for the proper consideration of the issues, including any item that the appellant should reasonably assume the respondent will rely on.[1]  Appellants' appendix does not begin to comply with the rule.  Instead, appellants left it up to respondents to demonstrate the basis for the trial court's ruling.

We affirm the order denying the motions to compel arbitration.  There was indeed "tons of litigation" during the period between filing the complaint and filing the first motion to compel arbitration, including a writ petition to this court and a petition for review to the California Supreme Court.  After making thorough use of the court system, the former clients have definitely waived any right they may have had to have this dispute arbitrated.  As for EA and Michael Avenatti, neither is a party to an agreement with SNP containing an arbitration provision.  Neither therefore has any basis upon which to compel arbitration.

**FACTS**

On July 21, 2008, the former clients entered into an attorney-client fee contract with three law firms:  EA,[2] SNP, and Panish, Shea & Boyle, LLP.  The law firms were hired on contingency to represent the former clients as plaintiffs in a malicious prosecution action against FLIR Systems, Inc.

The attorney-client fee contract contained the following arbitration provision:  "Any dispute arising under this Contract or in connection with Attorneys'

---

[1]     The appendix must also include the notice of election to use an appendix and the register of actions, neither of which can be found among appellants' "exhibits."  (See Cal. Rule of Court, rule 8.124(1)(A) and (C) and rule 8.122(b)(1)(F).)

[2]     Then called Eagan O'Malley & Avenatti, LLP.

3

services hereunder, including any claims by Client against Attorneys for malpractice or other tort claim, shall be resolved by binding arbitration before JAMS located in Santa Barbara, California. Such arbitration shall be conducted in accordance with the arbitration rules and procedures of JAMS then in effect. Client acknowledges that he has been fully advised of all the possible consequences of arbitration including but not limited to: [¶] a. If a malpractice action arises from this Agreement, neither Client nor Attorneys will have the right to a jury trial. [¶] b. Both parties retain the right to retain counsel to prepare their respective claims and/or defenses for the arbitration hearing. [¶] c. Client can choose to hire an attorney who may not request or whose retainer agreement does not contain an arbitration provision. [¶] Client and Attorneys further acknowledge that this provision does not apply to an action over fees and costs pursuant to California Business & Professions Code § 6204; an agreement to enter into binding arbitration with respect to fees and/or costs cannot be made unless such an agreement is in writing, and is made after the dispute over fees, costs, or both, has arisen."

In November 2009, the three law firms entered into a fee-sharing agreement, acknowledged and agreed to by the former clients. The agreement divided up "the payment of . . . attorneys' fees" in the malicious prosecution case among the three firms in the event of settlement or judgment. The fee-sharing agreement did not contain an arbitration provision.

In May 2011, the malicious prosecution action settled in mediation. The FLIR defendants agreed to pay the former clients $39 million on or before May 31. According to SNP, on the evening of May 31, after the settlement money had been paid,

4

the former clients faxed SNP a letter terminating its representation.  SNP calculated that it was owed $5.4 million.

EA filed a complaint for declaratory relief on June 14, 2011, seeking a ruling that SNP was not entitled to any recovery from the settlement.[3]  EA represented itself.  SNP cross-complained against EA and the former clients for breach of contract, conversion, and constructive trust in July 2011.[4]  A year later, the former clients, represented by EA, cross-complained against SNP and Robert Stoll.  In October 2012, the former clients filed a first amended cross-complaint against SNP and Robert Stoll.  EA and the former clients moved to compel arbitration in December 2012.  In December 2012, SNP named Michael Avenatti as a Roe cross-defendant.  Michael Avenatti moved to compel arbitration in January 2013.  SNP opposed both motions, which the court denied in March 2013.

That is the skeleton, as provided (mostly) by the appellants in their three-volume appendix.  Here is the flesh on the bones.

July 2011 – SNP demurs to the complaint.  EA demurs to the cross-complaint.  EA moves for a protective order, for an order quashing deposition subpoenas for the former clients, and for permission to file an early summary judgment motion.  EA files a request to stay SNP's cross-complaint against the former clients because they want to arbitrate the fee dispute with SNP under Business and Professions Code section 6201.[5]

---

[3] The complaint also named Robert Stoll individually as a defendant, alleging that he as well as SNP had entered into the fee-sharing agreement.  The fee-sharing agreement identifies only SNP as a party; Robert Stoll signed the agreement on SNP's behalf.

[4] Another law firm represented SNP in this litigation.

[5] Business and Professions Code section 6201, subdivision (b), provides in pertinent part:  "If an attorney, or the attorney's assignee, commences an action in any court or any other proceeding and the client is entitled to maintain arbitration under this article, and the dispute is not one to which subdivision (b) of Section 6200 applies, the client may stay the action or other proceeding by serving and filing a request for arbitration in accordance with the rules established by the board of trustees pursuant to subdivision (a) of Section 6200."

5

The court enters an order staying the cross-complaint. The former clients request fee arbitration before the San Francisco Bar Association. EA applies ex parte in the trial court to modify the stay order.

August 2011 – The trial court grants the ex parte application, vacates the stay order, and enters a new order, staying *only* the part of the SNP cross-complaint involving the fee dispute with the former clients. The rest of the cross-complaint goes forward. The trial court rules on the demurrers to the complaint and to the SNP cross-complaint. EA answers the SNP cross-complaint for itself, without mentioning arbitration. The court rules on the July discovery motions and the motion regarding an early summary judgment.

September 2011 – EA files a motion to quash a third-party subpoena from SNP. The San Francisco Bar Association rules that any fee dispute arbitration must take place before the Santa Barbara Bar Association.

October 2011 – EA files a motion for a protective order and a request for sanctions. EA files a motion for judgment on the pleadings against the SNP cross-complaint.[6] EA files a motion to compel further responses to requests for admissions and a motion to compel further responses to form interrogatory 17.1. Both discovery motions include requests for sanctions.

November 2011 – The trial court rules on the discovery motions regarding further responses and takes the motion to quash the third-party subpoena and the motion for judgment on the pleadings under submission.

---

[6] Although EA moved for judgment on the pleadings on its own behalf, the gravamen of the motion was the claim that the former clients had properly discharged SNP under the attorney-client fee contract and therefore SNP could recover only in quantum meruit.

December 2011 – SNP files a motion to compel further responses to document production demands.

January 2012 – The trial court rules on the motion for judgment on the pleadings filed in October 2011 and the motion to quash the third-party subpoena filed in September 2011. EA files a motion to compel further responses to special interrogatories and requests sanctions.

February 2012 – The former clients decide they do not want to proceed with fee dispute arbitration. They cancel the arbitration before the Santa Barbara Bar Association on the day before the hearing. EA applies ex parte to have the stay ordered in August 2011 lifted. One of the former clients files a motion to disqualify the judge (not for cause), which is granted. The case is transferred to another judge.

March 2012 – EA petitions this court for a writ of mandate, requesting an order to the trial court to grant the motion for judgment on the pleadings. The writ petition is denied. The former clients demur to the SNP cross-complaint. A trial setting conference is scheduled for May 2012.

April 2012 – EA petitions the California Supreme Court for review of this court's denial of the writ petition. SNP opposes the petition for review.

May 2012 – SNP files a first amended cross-complaint, once again naming EA and the former clients as cross-defendants.[7] The former clients demur to the first amended cross-complaint. At the trial setting conference, the court sets a jury trial date in March 2013. The record does not reflect any reference to arbitration at the trial setting conference. The petition for review in the Supreme Court is denied. EA answers SNP's first amended cross-complaint for itself, once again without mentioning arbitration.

---

[7] The causes of action in the first amended cross-complaint are: breach of contract against the former clients, based on the attorney-client fee contract; breach of contract against EA, based on the fee-sharing agreement; conversion against all cross-defendants; and constructive trust against all cross-defendants.

7

July 2012 – The former clients (represented by EA) answer SNP's first amended cross-complaint, alleging 21 affirmative defenses, not including arbitration. The former clients cross-complain against SNP. EA files a motion to have certain records sealed. SNP files a motion to enforce a deposition subpoena to a bank.

August 2012 – SNP demurs to the former clients' cross-complaint. SNP posts jury fees.

September 2012 – The court rules on SNP's motion to enforce the deposition subpoena to the bank and EA's motion to seal records (from July 2012). SNP files a motion to compel a deposition.

October 2012 – EA files a motion to quash a subpoena. The former clients file a first amended cross-complaint.

November 2012 – SNP files motions to compel further responses to special interrogatories and further responses to document production demands. SNP demurs to the former clients' first amended cross-complaint. The court rules on EA's motion to quash SNP's subpoena. SNP files a discovery motion.

December 2012 – EA and the former clients file a motion to compel arbitration. SNP files a motion for summary judgment on the same day as well as a motion to compel further responses to special interrogatories. SNP files another motion to compel further responses to special interrogatories a few days later. SNP files motions to compel further responses from the former clients to document production demands. SNP amends its first amended cross-complaint to name Michael Avenatti as a Roe cross-defendant as to the conversion and constructive trust causes of action.[8]

January 2013 – Michael Avenatti files a motion to compel arbitration.

March 2013 – The court denies the motions to compel arbitration and rules on the discovery motions (seven of them), as well as on SNP's motion for summary

---

[8] Michael Avenatti signed the fee-sharing agreement on behalf of EA. He also signed the attorney-client fee contract on behalf of EA.

judgment and on the former clients' demurrer to SNP's first amended cross-complaint. The reasons given for denying the motions to compel arbitration are EA's failure to show that SNP had refused to arbitrate, the untimeliness of the application "after tons of litigation," including the writ petition, and the proximity to the trial date.[9]

EA, the former clients, and Michael Avenatti have appealed from the denial of their motions to compel arbitration.

### DISCUSSION

**I.        The Former Clients' Motion to Compel Arbitration**

Code of Civil Procedure[10] section 1281.2 provides in pertinent part:  "On petition of a party to an arbitration agreement alleging the existence of a written agreement to arbitrate a controversy and that a party thereto refuses to arbitrate such controversy, the court shall order the petitioner and the respondent to arbitrate the controversy if it determines that an agreement to arbitrate the controversy exists, unless it determines that:  [¶] (a) The right to compel arbitration has been waived by the petitioner . . . ."  Whether a party has waived the right to compel arbitration is usually a question of fact, and we affirm the trial court's findings if they are supported by sufficient evidence. (*St. Agnes Medical Center v. PacifiCare of California* (2003) 31 Cal.4th 1187, 1196 (*St. Agnes*).)

As to the former clients' motion to compel arbitration this case closely resembles a case we decided in 2010, *Burton v. Cruise* (2010) 190 Cal.App.4th 939 (*Burton*), in which we upheld the trial court's denial of a petition after substantial litigation had occurred before arbitration was requested.  In *Burton*, a medical malpractice case, the plaintiff waited for 10 months after filing her complaint to move to

---

[9]        Because we affirm the trial court's ruling based on waiver, we do not address the other two reasons for denying the motion to compel arbitration.

[10]        All further statutory references are to the Code of Civil Procedure.

compel arbitration. In the meantime, she had participated in a case management conference, requested a trial date, and engaged in six months' worth of discovery. (*Id.* at p. 943.)

*Burton* lays out the analysis that applies to this case. We therefore quote at length from the opinion. "California law favors arbitrations as a relatively quick and cost-effective means to resolve disputes. [Citation.] There is a statutory exception where the 'right to compel arbitration has been waived' by the moving party. (§ 1281.2, subd. (a).) [¶] Although the statute speaks in terms of 'waiver,' the term is used '"as a shorthand statement for the conclusion that a contractual right to arbitration has been lost."' [Citation.] This does not require a voluntary relinquishment of a known right; to the contrary, a party may be said to have 'waived' its right to arbitrate by an untimely demand, even without intending to give up the remedy. In this context, waiver is more like a forfeiture arising from the nonperformance of a required act. [Citations.]

"In *St. Agnes*, our Supreme Court set forth a multifactor test to assess waiver claims. While waiver is not a mechanical process, and no one factor is predominant, the pertinent factors for this appeal are: (1) Did the party seeking arbitration act inconsistently with the right to arbitrate or otherwise substantially invoke the litigation process? (2) Are the parties 'well into preparation' of the lawsuit? (3) Is there an imminent trial date? (4) Has the delay affected, misled, or prejudiced the opposing party? [Citation.] [¶] . . . [¶]

"*St. Agnes* cautions us to examine each case in context. '[N]o single test delineates the nature of the conduct that will constitute a waiver of arbitration.' [Citation.] True, the mere filing of a complaint, without more, does not constitute the forfeiture of a right to contractual arbitration: 'In California, whether or not litigation results in prejudice also is critical in waiver determinations.' [Citation.] [¶] But does this mean that a litigant may wait until trial is due to commence before demanding

10

arbitration? To the contrary, in *Wagner Construction Co. v. Pacific Mechanical Corp.* (2007) 41 Cal.4th 19, the Supreme Court expressly observed that a party's unreasonable delay in demanding or seeking arbitration, in and of itself, may constitute a waiver of a right to arbitrate. '[A] party may [not] postpone arbitration indefinitely by delaying the demand . . . . [¶] When no time limit for demanding arbitration is specified, a party must still demand arbitration within a reasonable time. [Citation.] … "[W]hat constitutes a reasonable time is a question of fact, depending upon the situation of the parties, the nature of the transaction, and the facts of the particular case. "' [Citation.] [¶] And in *Adolph v. Coastal Auto Sales, Inc.* (2010) 184 Cal.App.4th 1443, 1452 (*Adolph*), we recognized that a party could not blow hot and cold by pursuing a strategy of courtroom litigation only to turn towards the arbitral forum at the last minute, thereby frustrating the goal of arbitration as a speedy and relatively inexpensive means of dispute resolution: 'We are loathe to condone conduct by which a [litigant] repeatedly uses the court proceedings for its own purposes . . . all the while not breathing a word about the existence of an arbitration agreement, or a desire to pursue arbitration . . . .' [Citation.]

"We recognize that waiver is not to be lightly inferred and the party seeking to establish it bears a 'heavy burden of proof,' with all doubts resolved in favor of arbitration. [Citation.] Like the 'clear and convincing' standard of proof, these higher burdens guide the trial court's determination, but do not alter the standard of review on appeal. '"It was the trial court's duty to determine whether" the petitioners met their "burden of proof; it is our duty to determine whether there is substantial evidence to support the trial court's findings that it did."' [Citations.] 'Although the burden of proof is heavy on the party seeking to establish waiver, which should not lightly be inferred in light of public policy favoring arbitration, a determination by a trial court that the right to compel arbitration has been waived ordinarily involves a question of fact, which is

11

binding on the appellate court if supported by substantial evidence. The appellate court may not reverse the trial court's finding of waiver unless the record as a matter of law compels finding nonwaiver.' [Citation.]

"On appeal, we review waiver as a factual inquiry for the trial court, and will affirm if substantial evidence supports the trial court's determination. (*Adolph, supra*, 184 Cal.App.4th at pp. 1449–1450.) We construe any reasonable inference in the manner most favorable to the judgment, resolving all ambiguities to support an affirmance. [Citation.]" (*Burton, supra,* 190 Cal.App.4th at pp. 944-946.)

Substantial evidence supported the trial court's determination in this case that the former clients had waived their right to arbitration under the attorney-client fee contract. The former clients' delay was considerably more egregious than that in *Burton*. In the case now before us, the parties engaged in 18 months of litigation – from July 2011 to December 2012 – before the former clients moved to compel arbitration.[11] And, as the recitation of the facts demonstrates, these months were filled with incident. Hardly a month went by without motions being filed, opposed, replied to, or heard and ruled on. On March 7, 2013, the date of the hearing on the petition to compel arbitration, there were 10 other motions on calendar – a motion for summary judgment, a demurrer and a motion to strike, and seven discovery motions. The trial date was less than a month away. And for all this time – through a trial setting conference, the posting of jury fees, and an answer – the former clients never "breathed a word" about arbitration under the attorney-client fee contract.

All but conceding that delay was egregious, appellants argue that notwithstanding the delay, SNP was not prejudiced. Appellants contend, in effect, that

---

[11] Although part of the SNP cross-complaint was stayed between July 2011 and February 2012 to permit a fee dispute arbitration, the rest of the case went forward, including the portion dealing with conversion. After several months' delay, the former clients changed their minds about fee arbitration and went back to litigating in court. They waited almost a year after that to request arbitration.

12

nothing happened in the trial court that would not have happened in arbitration, so SNP was not put to any additional expense. Therefore no prejudice.[12]

This argument is unavailing. As we said in *Burton*, delay itself, if long enough, can amount to prejudice. "As the Supreme Court explained in *St. Agnes*, prejudice is typically found where 'the petitioning party's conduct has substantially undermined [the] important public policy [in favor of arbitration] or substantially impaired the other side's ability to take advantage of the benefits and efficiencies of arbitration.' [Citation.]

"In *Sobremonte v. Superior Court* (1998) 61 Cal.App.4th 980, 995 (*Sobremonte*), the appellate court found that a bank waived its right to arbitrate a dispute with its customers by waiting to demand arbitration until its customers 'spent 10 months preparing their case for a full trial at a considerable expenditure of time and money . . . . Their counsel expended over 200 hours in trial preparation. [The customers] incurred attorney fees and costs for conducting discovery and taking depositions. They were well into case preparation, and a little over a month to trial, when the Bank made its motion to compel.' The bank's delay deprived the customers of any benefits to be gained from arbitration. 'If we consider the amount of time and money they have already spent in the judicial system, any benefits they may have achieved from arbitration have been lost.' [Citation.]" (*Burton, supra,* 190 Cal.App.4th at p. 947.)

The recently decided case of *O'Donoghue v. Superior Court* (2013) 219 Cal.App.4th 245, cited in appellants' reply brief, does not compel a different result. In *O'Donoghue*, the reviewing court *agreed* with appellants that the party requesting judicial reference had delayed seeking the reference and had exhibited litigation conduct

---

[12] Appellants rely heavily on *Groom v. Health Net* (2000) 82 Cal.App.4th 1189 in making this argument. As we stated in *Burton*, we decline to follow *Groom*'s analysis on this issue. (See *Burton, supra*, 190 Cal.App.4th at p. 948.)

13

inconsistent with an intent to proceed before a referee, both factors supporting a waiver. (*Id.* at p. 263.) The reviewing court found, however, that two other factors – substantial invoking of the litigation machinery and substantial preparation of a lawsuit – did not support waiver. (*Id.* at p. 264.) The court therefore upheld the trial court's order *granting* the petition to compel judicial reference and its determination that no waiver had occurred, under the abuse of discretion standard of review. (*Id.* at p. 265.)

In this case, all four factors support the trial court's order denying the former clients' petition to compel arbitration under the abuse of discretion standard because of waiver. They delayed seeking arbitration under the attorney-client fee contract for many months, even after they head-faked by seeking Business and Professions Code fee dispute arbitration and then canceling it. They "substantially invoked" the litigation machinery through motions for rulings on the merits – two demurrers and a motion for judgment on the pleadings that would have benefited them as much as EA if it had been granted.[13] Trial preparation was also well advanced. A trial date was fast approaching; a trial setting conference had been held and jury fees posted. All this had occurred without any reference to arbitration under the attorney-client fee contract.

In addition to the delay and the substantial investment in trial preparation,[14] appellants have used the litigation machinery in other ways to disadvantage SNP. To take the most obvious example, appellants would not be eligible for writ relief in an arbitration. They would not be able to get any review at all of the merits of their claims.

---

[13] Although the writ petition and petition for review were ostensibly filed by EA, we cannot overlook the position EA occupied in this litigation. It was a plaintiff, counsel for a plaintiff and cross-defendant (itself), and counsel for co-cross-defendants (the former clients). To argue, as appellants did, that the former clients' participation in litigation before filing the petition to compel arbitration was minimal is to ignore the alignment between EA's interests and those of the former clients.

[14] SNP's counsel stated that the firm had incurred approximately $150,000 in fees by the time of the petition to compel arbitration, not including the fees spent to prepare for the fee dispute arbitration that never happened.

14

(See *Moncharsh v. Heily & Blase* (1992) 3 Cal.4th 1, 11.)  So SNP would not have been put to the expense of opposing a petition for review in the California Supreme Court after this court denied EA's writ petition.  Appellants would also not have been able to file a disqualification motion – as did one of the former clients – to get rid of an arbitrator about whom they were having second thoughts.[15]

The bulk of the litigation, however, concerned discovery, and appellants argue that they would have been able to do discovery in the arbitration anyway.  This is questionable at best.  The arbitration provision did not incorporate or refer to section 1283.05, which authorizes full-blown discovery in arbitration.  In the absence of a "dispute, controversy, or issue arising out of or resulting from any injury to, or death of, a person caused by the wrongful act or neglect of another," the arbitration agreement had to provide for the incorporation of Code of Civil Procedure discovery procedures.  (See § 1283.1, subd. (b).)  It did not.

Instead, the parties to the attorney-client fee contract agreed to be governed by JAMS rules and procedures.  Rather than adhering to the Code of Civil Procedure, the JAMS "exchange of information" rule more closely resembles Rule 26 of the Federal Rules of Civil Procedure, especially the early meeting of counsel.[16]  JAMS requires the

---

[15] The motion disposed of the judge who had denied EA's motion for judgment on the pleadings based on the quantum meruit theory.  The former clients then reiterated the arguments supporting the motion for judgment on the pleadings in their demurrer to the SNP cross-complaint before the new judge.

[16] Rule 26(a)(1)(A) of the Federal Rule of Civil Procedure (28 U.S.C.) provides:  "Initial Disclosure. [¶] [] In General. Except as exempted by Rule 26(a)(1)(B) or as otherwise stipulated or ordered by the court, a party must, without awaiting a discovery request, provide to the other parties: [¶] (i) the name and, if known, the address and telephone number of each individual likely to have discoverable information – along with the subjects of that information – that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment; [¶] (ii) a copy – or a description by category and location – of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses, unless the use would be solely for impeachment; [¶] (iii) a computation of each category of damages claimed by the disclosing party – who must also make available for inspection and copying as under Rule 34 the documents or other evidentiary material, unless privileged or protected from disclosure, on which each computation is based, including materials bearing on the nature and extent of injuries suffered; and [¶] (iv) for inspection and copying as under Rule 34, any insurance agreement under which an insurance business may be liable to satisfy all or part of a possible judgment in the action or to indemnify or reimburse for payments made to satisfy the judgment."  Under Rule 26(f), the parties must confer no later than 21 days before a scheduling conference is held to discuss the disclosures mandated by the rule and must prepare a joint report to be submitted to the court within 14 days after the conference.

parties to exchange all documents supporting their claims and the names and addresses of witnesses no later than 21 days after the notice of claims has been received.[17] The JAMS rule also, like federal law but unlike California law, imposes a continuing discovery obligation on the parties.[18] (Cf. Fed. Rules of Civ. Proc., rule 26(e)(1)(A) 28 U.S.C. and § 2030.060, subd. (g).)

While some discovery may still be necessary under the JAMS regime, it is likely to be less expensive and time-consuming because of the disclosure obligations. In addition, JAMS permits more expeditious resolution of discovery disputes – an arbitrator is more likely than a judge to be available to resolve issues promptly, and a formal hearing may not be necessary. JAMS arbitrators can resolve these disputes through telephone conferences.[19] Delay has caused all of these time- and resource-saving aspects of arbitration to be lost. This amounts to substantial prejudice.

## II.   EA's and Michael Avenatti's Motions to Compel Arbitration

In addition to participating on its own behalf in the "tons of litigation" leading up to the motion to compel arbitration, EA failed to show that it is a party to an agreement with SNP containing an arbitration provision. "When 'the language of an arbitration provision is not in dispute, the trial court's decision as to arbitrability is subject to de novo review.' [Citation.] Thus, in cases where 'no conflicting extrinsic evidence is introduced to aid the interpretation of an agreement to arbitrate, the Court of Appeal reviews de novo a trial court's ruling on a petition to compel arbitration.' [Citation.]" (*Molecular Analytical Systems v. Ciphergen Biosystems, Inc.* (2010) 186 Cal.App.4th 696, 707.) "The strong public policy in favor of arbitration does not extend

---

[17]   We informed the parties of our intent to take judicial notice under Evidence Code sections 452 and 459 of the JAMS discovery rules. None of the parties objected. The Comprehensive Arbitration Rules and Procedures are available on the JAMS website, *www.jamsadr.com*.

[18]   The rule also limits depositions to one for each side; the arbitrator must approve additional depositions.

[19]   As a practical matter, participants in an arbitration are also more likely to cooperate with each other in discovery if only to avoid giving the arbitrator a bad impression of their reasonableness and overall worthiness before the arbitrator has to make a decision on the merits.

16

to those who are not parties to an arbitration agreement, and a party cannot be compelled to arbitrate a dispute that he has not agreed to resolve by arbitration." (*Benasra v. Marciano* (2001) 92 Cal.App.4th 987, 990.)[20]

The fee-sharing agreement, the sole contractual basis for SNP's dispute with EA over the division of the settlement proceeds, contains no arbitration provision. The attorney-client fee contract, which does have an arbitration provision, is a contract between the lawyers and the former clients.[21] It is not a contract among the law firms designated as the "Attorneys" in the first paragraph, and it does not mention fee-sharing or division of proceeds. Nothing in the attorney-client fee contract suggests that the lawyers agreed to arbitrate with each other. (See *Lindemann v. Hume* (2010) 204 Cal.App.4th 556, 570 [arbitration agreement does not apply to "internecine disputes"].)

The same analysis supports the denial of Michael Avenatti's individual motion to compel arbitration. Although he promptly requested arbitration after being named as a Roe cross-defendant, he also is not a party to an agreement with an arbitration provision. He signed both the fee-sharing agreement and the attorney-client fee contract as a representative of his law firm, not as an individual. Even assuming he could compel arbitration in his individual capacity by virtue of being EA's agent (see, e.g., *Dryer v. Los Angeles Rams* (1985) 40 Cal.3d 406, 418; *Berman v. Dean Witter & Co., Inc.* (1975) 44 Cal.App.3d 999, 1004), EA itself has no basis upon which to compel SNP to arbitrate with it. Accordingly, his individual motion to compel arbitration was properly denied.

---

[20] Although the trial court did not explicitly cite lack of an arbitration agreement among its reasons for denying EA's and Michael Avenatti's motions, we review the result, not the reasoning. (See *Bains v. Moores* (2009) 172 Cal.App.4th 445, 478; *Luther Burbank Savings & Loan Assn v. Community Construction, Inc.* (1998) 64 Cal.App.4th 652, 660; *Economic Empowerment Foundation v. Quackenbush* (1997) 57 Cal.App.4th 677, 692, fn. 13.)

[21] The opening paragraph of the attorney-client fee contract recites: "This ATTORNEY-CLIENT FEE CONTRACT (this "Agreement") is the written fee contract that California law requires lawyers to have with their clients. It is between Panish Shea & Boyle LLP, and Stoll Nussbaum & Polakov LLP, and Eagan O'Malley & Avenatti, LLP (collectively, the "Attorneys") and William Parrish and E. Timothy Fitzgibbons (collectively, the "Client").

## DISPOSITION

The order denying appellants' motions to compel arbitration is affirmed. Respondents are to recover their costs on appeal.


BEDSWORTH, J.

WE CONCUR:


RYLAARSDAM, ACTING P. J.


MOORE, J.

18